**MATTHEW RIGHETTI, ESQ. {121012}**
**matt@righettilaw.com**
**JOHN GLUGOSKI, ESQ. {191551)**
**jglugoski@righettilaw.com**
**MICHAEL RIGHETTI, ESQ. {258541}**
**mike@righettilaw.com**
**RIGHETTI • GLUGOSKI, P.C.**
456 Montgomery Street, Suite 1400
San Francisco, CA 94104
Telephone: (415) 983-0900
Facsimile:   (415) 397-9005

**CHARLES A. JONES, ESQ. {SBN 224915}**
**KELLY MCINERNEY, ESQ. {SBN 200017}**
**JONES LAW FIRM**
9585 Prototype Court, Suite B
Reno, Nevada 89521
Telephone:  (775) 853-6440
Facsimile:   (775) 853-6445

Attorneys for Plaintiff, individually, and on behalf of others similarly situated

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAOUL BENNETT, on behalf of herself and all similarly situated persons,<br><br><br>Plaintiff,<br><br>vs.<br><br>Lead Info Stream Inc., dba Promedia Leads, and LeadPoint, Inc.<br><br>Defendants | *Case No.: 3:14-cv-01316-H-JLB*<br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>*Hon. Marilyn L. Huff*<br><br>Date: June 13, 2016<br>Time: 10:30 a.m.<br>Courtroom 15A |

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................ *iii-iv*

I.      INTRODUCTION ................................................................ …2

II.     FACTUAL BACKGROUND AND HISTORY OF
        LITIGATION ................................................................ 2

III.    KEY TERMS OF THE SETTLEMENT ............................................... 7

        A. Settlement Class ................................................................ 7

        B. The Settlement Fund and payment to Class Members .................... 8

            1. Maximum Settlement Fund ……………………………………….8
            2. Monetary Award to Class Members …………………….....9
            3. Prospective Relief …………………………………….....9

        C. Class Notice and Claim/Objection/Opt-Out Procedures ............... 10

        D. Scope of Release ................................................................ 11

        E. Opportunity to Request Exclusion or Object ............................... 12

        F. Payment of Notice and Administrative Cost
            By Defendant ................................................................ 12

        G. Plaintiff's Application for Attorneys' Fees, Litigation
            Costs and Class Representative Enhancement ........................... 12

IV.     ARGUMENT ................................................................ 13

        A. Legal Standards for Final Approval of a
            Class Action Settlement ................................................. 13

*i*

B. The Proposed Settlement Class Meets the Standard
for Final Approval ........................................................16

    1. Sufficient Discovery Has Taken Place to
Justify the Settlement ……………………………………16

    2. Presumption of Fairness ...................................................... 17

    3. Both Parties Face Significant Challenges ……………………19

    4. The Settlement has Achieved a Fair Result for
the Class Members Who Submitted Claims …………………..21

    5. The Settlement Includes Prospective Relief …………………..22

    6. The Low Claim Rate Should Not Prevent
Final Approval ……………………………………………...22

C. The Low Claim Rate Should Not Affect the Court's
Ruling On Plaintiff's Motion for Attorneys' Fees,
Reimbursement of Litigation Costs or Request for
Class Representative Enhancement ............................................23

D. Costs of Administration ................................................. .23

V. CONCLUSION ……………………………………………...24

1
2

# **TABLE OF AUTHORITIES**

3

## **FEDERAL CASES**

4

*Beecher v. Able,*
441 F.Supp. 426 (S.D.N.Y.1977) ........................................................... 22

5
6

*Bellows v. NCO Fin. Sys., Inc.,*
No. 07-CV-1413 W (AJB), 2009 WL 35468, at *7
 (S.D. Cal. Jan. 5, 2009) ...................................................................... 22

7
8

*Carroll v. Wolpoff & Abramson,*
961 F.2d 459 (4th Cir.1992), 505 U.S. 905 (1992) ............................... 23

9
10

*City of Riverside v. Rivera,*
477 U.S. 561, 581 (1986) ...................................................................... 23

11
12

*Hammon v. Barry*,
752 F. Supp 1087 (DDC 1990) …………………………………………..17

13
14

*Hanlon v. Chrysler Corp*.,
150 F.3d 1011, 1026 (9th Cir. 1998) …………………………………….13

15
16

*In re Armored Car Anti-Trust Litigation*,
472 F. Supp 1357 (ND GA 1979) …………………………………………..17

17
18

*In re Chicken Anti-Trust Litigation*,
560 F. Supp 957, 962 (MD GA 1980) …………………………………...17

19
20

*In re Warner communications Sec. Litig.*,
618 F.Supp.7635, 741 (S.D.N.Y 1985) …………………………………..16

21
22

*Girsh v. Jepson*,
521 F.2d 153, 157 (3d Cir. 1975) …………………………………………...16

23
24

*Malta v. Fed. Home Loan Mortgage Corp.*,
No. 10-CV-1290 BEN NLS, 2013 WL 444619,
at *4-5 (S.D. Cal. Feb. 5, 2013) ………………………………………….21

25
26
27

*Mars Steel Corp. v. Continental Illinois National Bank and Trust Co.*,
834 F.2d 677, 681 (7th Cir. 1987) …………………………………………17

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Officers for Justice v. Civil Service Comm'n*,
688 F.2d 615, 625 (9th Cir. 1982) ……………………………………………..13

*Pridd v. Edelman*,
883 F.2d 438, 447 (6th Cir. 1989) ………………………………………….13, 17

*Rose v. Bank of Am. Corp.*,
Case No. 11-cv-02390-EJD ………………………………………………...21

*Sommers v. Abraham Lincoln Federal Savings & Loan Association*,
79 F.R.D. 571 (ED PA 1978) ……………………………………………17

*Steinberg v. Carey*,
470 F. Supp 471 (SD NY 1979) …………………………………………..17

*Von Bronkhorst v. Safeco Corp.*,
529 F.2d 943, 950 (9th Cir. 1989) …………………………………………...13

*Weinberger v. Kendrick*,
698 F.2d 62, 75 (2d Cir. 1982) …………………………………………...16

### RULES & STATUTES

CCCP § 1542 ……………………………………………………………..11

F.R.C.P. 23(a) …………………………………………………………….7

F.R.C.P 23(e) …………………………………………..……………*passim*

Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ……………*passim*

### OTHER AUTHORITIES

*Manual for Complex Litigation* (4th Ed.) ……………………………………14

*Newberg on Class Actions* (4th Ed.) …………………………………..*passim*

## I.  INTRODUCTION

Plaintiff, on behalf of herself and the certified class of individuals she represents, submits this memorandum of points and authorities in support of her motion for final approval of a class action settlement pursuant to Rule 23(e) of the Fed. R. of Civ. Proc.[1]  The proposed settlement was reached on the eve of trial through arm's length bargaining lasting several months following hard fought litigation that commenced over two years ago in May of 2014.   The Court recently found the terms of the settlement agreement to be within the range of reasonableness and granted Plaintiff's motion for preliminary approval on March 3, 2016 (ECF Document 95).   Thereafter, the claims administrator, Heffler Claims Group, administered the Court approved notice procedure, and the time period to submit claims, object or request exclusion from the settlement concluded on April 25, 2016.   All tolled, 519 valid claim forms have been received to date.   There were no requests for exclusion and no objections submitted by Class Members.   This memorandum of points and authorities provides further details on the settlement, including the results of the notice and claim process, which should guide the Court in granting final approval.

For the reasons set forth below, Plaintiff and Class Counsel believe the settlement is fair, reasonable, adequate, and Plaintiff requests that the Court grant final approval of the settlement terms as set forth herein.

## II. FACTUAL BACKGROUND AND HISTORY OF LITIGATION

Plaintiff provided the following summary of the litigation in its motion for preliminary approval and includes it here again for the Court's convenience:

- Co-Defendant Lead Info Stream, Inc. (now bankrupt) engaged in the business of generating consumer leads for, among other things, home mortgage refinancing.  Lead Info Stream ("LIS") purchased records showing identities and

---

[1]    A true and correct copy of the fully executed Settlement Agreement is marked and attached to the Declaration of Matthew Righetti as Exhibit 1.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

contact information from various sources and telemarketed the individuals using an automatic telephone dialing system to generate consumer leads interested in home mortgage refinancing.   When LIS generated a consumer lead, it then inputted that lead into co-Defendant LeadPoint's marketing platform, where home mortgage finance companies (such as Quicken Loans and Loan Depot) could purchase the leads and solicit the individuals with home mortgage refinance products and services.   LeadPoint received a commission from the sale and the remainder of the proceeds from the purchase of the leads passed to LIS.

- Plaintiff, Raoul Bennett, received eight separate calls during the summer of 2013 from LIS regarding home mortgage refinancing.   On May 28, 2014, she filed a putative class action in the United States District Court for the Southern District of California, captioned Raoul Bennett, individually and on behalf of all others similarly situated, v. Lead Info Stream Inc. d/b/a Promedia Leads and LeadPoint, Inc., Case No. 3:14-cv-01316 (the "Action") alleging claims for damages and injunctive relief against Defendant LeadPoint, Inc. for using an ATDS for making unsolicited telephone calls  to cellular telephone numbers in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA").  (ECF Document No. 1).   Plaintiff further alleged that Defendant LIS initiated the allegedly illegal telemarketing calls on behalf of co-Defendant LeadPoint.   As a result, Plaintiff alleged that LeadPoint was vicariously liable for LIS' illegal telemarketing practices.

- On June 16, 2014, Defendants filed a Motion to Dismiss the Complaint (ECF Document No. 5).   On July 24, 2014, the Court entered an Order Granting in Part and Denying in Part the Motion to Dismiss, and the Court dismissed Plaintiff's Complaint without prejudice as to Defendant LeadPoint. The Court granted Plaintiff 30 days to file an amended complaint (ECF Document No. 12).

- On August 12, 2014, Plaintiff filed the First Amended Complaint for Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* (ECF Document No. 13).   Defendants filed a second Motion to Dismiss (ECF Document No. 14); however, the Court denied the motion on September 24, 2015 (ECF Document 21).   On October 15, 2014, Defendants filed its Answer to Plaintiff's First Amended Complaint (ECF Document 22).

- On December 4, 2014 the Court held an Early Neutral Evaluation Conference; however, the action did not settle, and following a telephonic case management conference on January 16, 2015, the Court issued an Order Regulating Discovery and Other Pretrial Proceedings on February 5, 2015 (ECF Document No. 35).

- Over the course of several months the parties conducted extensive formal discovery, including special interrogatories, requests for production of documents, requests for admissions, depositions and third party subpoenas for documents and electronic records.   Defendant deposed Plaintiff on January 26, 2015.  Plaintiff deposed Defendant LeadPoint on March 9, 2015.  In addition, the parties deposed several other individuals, including Jeff Randol, Lead Info Stream's global director of communications, in Fort Collins, Colorado, and Nicholas Passallacqua (CEO of Save Big Leads), in Miami, Florida.  Plaintiff also issued formal discovery to Anthony Ferlanti (CEO of Impression Media) and Connect First, Inc. (Defendant's automatic telephone dialing system hardware/software provider).   Through the various subpoenas and deposition notices requesting documents, the parties received excel spreadsheets with several hundreds of thousands of rows of telephone data regarding the identities of potential class members, records of all telephone calls placed by LIS using Connect First software during the class period, and invoices, payments and other

records relevant to LIS' telemarketing operations. (Decl. of Matthew Righetti, ¶ 5.

- On March 3, 2015, a Notification of Bankruptcy was filed with the Court as to LIS, and Defendant LeadPoint simultaneously filed an emergency motion to stay (ECF Documents 36 and 37).  Plaintiff opposed the motion, and the Court denied the motion without prejudice, thereby ordering the litigation to continue as to Defendant LeadPoint (ECF Document 41).

- On April 30, 2015, LeadPoint filed a motion for summary judgment (ECF Document 42).  Plaintiff opposed the motion (ECF Document 43).  The Court granted the motion in part and denied the motion in part finding that Plaintiff provided oral consent to receive subsequent calls from LIS during one of the allegedly illegal telephone calls Lead Info Stream placed to Plaintiff (ECF Document No. 48).

- On June 19, 2015, Plaintiff filed a Motion for Class Certification (ECF Document 49).  LeadPoint opposed the motion (ECF Document 53).  On August 10, 2015, the Court granted the motion with a modified class definition that certified the following class:

> All individuals in the United States and its territories: (i) for whom LIS obtained leads as a result of their providing information on http://safeapply.com/LendingConsultant/ between May 28, 2010 and the present and (ii) who received at least one telephone call on their cellular telephone that was made or caused to be made by LIS between May 28, 2010 and the present through an ATDS (iii) that resulted in those individuals' information being posted on LeadPoint's platform—and (iv) excluding any calls made after the date those individuals' information was posted on LeadPoint's platform.

- After the Court granted certification, LeadPoint again sought to stay the case pending the United States Supreme Court's decision in *Spokeo Inc. v. Robins* (ECF Document 58).  Plaintiff opposed the motion, and the Court denied it on October 8, 2015 (ECF Document 69).

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

- While the motion to stay action was pending, LeadPoint moved to decertify the class (ECF Document 63) and simultaneously Plaintiff moved to modify the class definition and facilitate notice (ECF Document 66).  The Court heard oral argument during the same hearing and later denied both motions on November 3, 2015 (ECF Document 77).

- On November 6, 2015 the Court ordered the parties to email the Court-approved notice with a slightly modified class definition to "potential class members."  (ECF Docket 82).  On December 9, 2015, Gilardi & Co., LLC executed the email notice to 42,285 potential class members, comprised of all individuals who appeared on LeadPoint's platform that were dialed by LIS on a cell phone.

- With the January 11, 2016 final pretrial conference date looming, the parties prepared and filed their respective exhibit lists, witness lists, trial briefs and memorandum of facts and contentions of law (ECF Document Nos. 85-89). Despite labor intensive trial preparation and after months of protracted negotiations between the parties, the parties reached a settlement and filed a Joint Motion for Settlement and requested to vacate trial dates (ECF Document 90). The Court granted the motion and ordered Plaintiff to file her motion for preliminary approval by January 25, 2016 (ECF Document 91).

- In reaching this settlement, LeadPoint (through its counsel) made material representations about its financial condition both verbally and in writing. Subject to the stipulated protective order regarding information designated as "confidential," LeadPoint provided audited financial information to support its contention that any sizeable judgement in this case would force LeadPoint's lenders to call their secured loans and force the company into bankruptcy. Plaintiff's counsel has relied on that information as a material representation that supports the substantial discount being provided to LeadPoint as well as the

reversion of unclaimed funds to Defendant.  Had LeadPoint been solvent then Class Counsel would not have agreed upon the "reversionary" terms being presented to the court.  Decl. of Matthew Righetti, ¶ 7.

- On March 3, 2016, the Court granted Plaintiff's motion for preliminary approval and certified the following class for settlement purposes, which was slightly different than the class certified by the Court following Plaintiff's motion for class certification:

> All individuals in the United States and its territories: (i) for whom LIS obtained leads between May 28, 2010 and the present and (ii) who received at least one telephone call on their cellular telephone that was made or caused to be made by LIS between May 28, 2010 and the present through an ATDS (iii) that resulted in those individuals' information being posted on LeadPoint's platform—and (iv) excluding any calls made after the date those individuals' information was posted on LeadPoint's platform.

(ECF Document 95, pg. 7).  Thereafter, Heffler Claims Group executed the Court-approved notice process, the details and results of which are set forth herein.

## III.   KEY TERMS OF THE SETTLEMENT

### A. Settlement Class

As noted above, on August 10, 2015, the Court found that Plaintiff met her burden of demonstrating the requirements Fed. R. Civ. Proc. 23(a) and (b) had been met and certified the following class for trial:

> All individuals in the United States and its territories: (i) for whom LIS obtained leads as a result of their providing information on http://safeapply.com/LendingConsultant/ between May 28, 2010 and the present and (ii) who received at least one telephone call on their cellular telephone that was made or caused to be made by LIS between May 28, 2010 and the present through an ATDS (iii) that resulted in those individuals' information being posted on LeadPoint's platform—and (iv) excluding any calls made after the date those individuals' information was posted on LeadPoint's platform.

The proposed settlement includes all individuals who potentially fall within the certified class as well as individuals whose information was obtained by Lead Info Stream via other sources in addition to the SafeApply website ("potential class members.")   The Settlement Class, therefore, is specifically defined in the Agreement as:

> All individuals in the United States and its territories: (i) for whom LIS obtained leads between May 28, 2010 and the present and (ii) who received at least one telephone call on their cellular telephone that was made or caused to be made by LIS between May 28, 2010 and the present through an ATDS (iii) that resulted in those individuals' information being posted on LeadPoint's platform—and (iv) excluding any calls made after the date those individuals' information was posted on LeadPoint's platform.

Settlement Agreement, § 1.30.  Thus, it is consistent with the Court's Minute Order in so far as the settlement class includes the same individuals to whom the parties sent notice of the order certifying the class.

## B. The Settlement Fund and Payment to Class Members

Under the Settlement Agreement, LeadPoint agrees to pay the following:

1) **Maximum Settlement Fund:** The Maximum Settlement Fund under the Settlement is $845,700.00.   The Total settlement fund was calculated by multiplying each potential class members' claim of twenty dollars ($20) per class member times the approximate number of Class Members (42,285).   The Settlement Fund represents the maximum amount LeadPoint could be responsible for paying pursuant to the Agreement and includes all payments for Approved Claims to Class Members, administrative expenses, any incentive award awarded to Plaintiff, and any attorneys' fees, costs or expenses the Court may award to Class Counsel. Settlement Agreement, § 1.32.  Any unclaimed moneys from the Settlement Fund and/or uncashed checks will revert to

Defendant. Settlement Agreement, § 2.1(a) and Decl. of Matthew Righetti, ¶ 6.

2) **Monetary Award to Class Members:** The monetary award for Approved Claims is twenty dollars ($20.00).  Settlement Agreement, §1.1. Each Class Member had the opportunity to submit one claim, and if valid and timely submitted, said Class Member will receive $20.00. Settlement Agreement, § 1.32.  The most recent report and declaration from Teresa Sutor on behalf of Heffler Claims Group shows that 519 valid claims were received, 516 claims were received electronically and 3 paper claims were received via regular mail.  Additionally, 153 paper claims were received from individuals without Class Member ID's and whose names did not match any of the class list. Those claims have been deemed invalid and/or fraudulent. See Declaration of Teresa Y. Sutor in Support of Motion for Final Approval.  <u>If the Court grants final approval, the monetary award to Class Members will be $10,380.00 for the 519 Class Members who submitted valid claims</u>.

3) **Prospective Relief:** In addition to the monetary award for Class Members who submitted timely claims, the Settlement Agreement importantly contains prospective relief as a means to ensure that LeadPoint ceases its practices of making telemarketing calls using an automatic telephone dialing system without the express consent of the party called and that it will not permit its vendors to use its platform unless vendors can verify that they obtained express consent to dial the leads that are being submitted to the platform.  It states:

> LeadPoint agrees not to conduct any future marketing activities by means of ATDS (Automatic Telephone Dialing System) whereby it initiates or causes to initiate unsolicited "robocall" transmissions or other telemarketing calls without express consent of the intended recipient of the call in the United States

or its Territories. Furthermore, LeadPoint agrees that it shall not permit vendors to conduct lead generation via LeadPoint's platform unless LeadPoint has taken appreciable steps to verify that such vendor complies with the TCPA, including but not limited to, verifying that the vendor has obtained express consent from the individuals prior to telemarketing them. (Settlement Agreement, §2.2)

## C. Results of Class Notice and Claim/Objection/Opt-Out Procedures

The Declaration of Teresa Y. Sutor, Client Services Manager for Heffler Claims Group explains in detail the work performed by Heffler to administer the Court-approved notice process.

The pertinent points of the Sutor Declaration state as follows:

- Heffler received Class Member data from Defendant on January 4, 2016, which contained 42,285 records of names, addresses and email addresses. Heffler consolidated the data into 40,666 unique email addresses belong to Class Members.

- After further organizing the data, Heffler sent 40,666 email notices and 1,564 paper notices by mail.

- Heffler established a toll free number and website.  Heffler received 29 calls to the toll free number, the website had 6,804 visits.

- After Heffler sent 40,666 email notices, Heffler determined that 391 Class Member did not receive the email, so Heffler physically mailed those 391 Class Members the paper notice to the address of record.

- 195 physical paper notices were returned as undeliverable, and Heffler skip-traced those addresses and remailed the physical notices to 129 updated addresses.

- The time period to submit claims, request exclusion from the settlement or object to the settlement expired on April 25, 2016 and as of May 12, 2016, Heffler has received 0 requests for exclusion and 0 objections from Class Members.

The detailed work performed by Heffler confirms that it provided the best notice practicable.  Moreover, the lack of any objectors or requests for exclusion supports a finding that the settlement is fair, reasonable and adequate.

## D. Scope of the Release

The scope of the release by all Class Members is narrowly tailored to the scope of Plaintiff's allegations.  It specifically releases the Released Parties from:

> any and all actual claims, demands, liabilities, rights, causes of action, damages, punitive, exemplary or multiplied damages, expenses, costs, attorneys' fees and or obligations (including "Unknown Claims" as defined below), arising out of the facts, transactions, events, matters, occurrences, acts, disclosures, statements, misrepresentations, omissions or failures to act that were pled in the operative complaint relating to LeadPoint, Lead Info Stream, Inc. dba ProMedia Leads and Pro Media, Inc. and any representatives of these persons or entities, allegedly making unsolicited telephone calls using an ATDS to cellular telephone numbers  and  any resulting damages arising therefrom pursuant to the Telephone Consumer Protection Act. Specifically excepted from Released Claims are any claims that any governmental agency or governmental actor has against the Defendant and any claims Defendant may have against Lead Info Stream, Inc. d/b/a Promedia Leads and Pro Media, Inc., or any other of Defendant's vendors involved in LeadPoint's alleged use of any ATDS to make unsolicited telephone calls to cellular telephone numbers as described in the Action.

Settlement Agreement, § 1.24.

Released Parties is defined in the Settlement Agreement as follows:

> Defendant LeadPoint, Inc. and any and all of its attorneys, present or past shareholders, owners, officers, directors, administrators, predecessors, successors, assigns, parents, affiliates, subsidiaries, associates, employers, employees, agents, customers (including but not limited to Quicken Loans, Inc. and LoanDepot.com, LLC) and vendors Lead Info Stream, Inc. d/b/a Promedia Leads and Pro Media, Inc., or any other representative of these persons or entities.

Settlement Agreement, § 1.25.

In addition to the above Release, Plaintiff agreed as to herself only to release any and all claims, both known and unknown, and expressly waives the provisions, right and benefits of § 1542 of the California civil Code. Settlement Agreement, § 1.33.

### E. Opportunity to Request Exclusion or Object

Pursuant to the terms of the Settlement Agreement, Class Members had the right to opt out of the Settlement or to object to its terms.  Settlement Agreement, §§ 4.3-4.5.   The deadline to do so was April 25, 2016, and Heffler claims Group received no objections or requests for exclusion.  Nevertheless, a failure to object in writing does not prevent a Class Member from appearing in person at the final approval hearing to object in person.  The parties will address any objections at the final approval hearing should anyone appear in person to object to the settlement.

### F.  Payment of Notice and Administrative Costs by Defendant

The costs of notice and settlement administration are to be paid by Defendant out of the Settlement Fund, subject to Court approval.   Settlement Agreement, §1.28.  Heffler Claims have incurred $70,450.00 in administration costs, which is consistent with Heffler's initial proposal to administer the settlement.  See Sutor Declaration.

### G. Plaintiff's Application for Attorneys' Fees, Litigation Costs and Class Representative Enhancement.

Pursuant to the Settlement Agreement, Plaintiff has made a request via noticed motion for attorneys' fees and litigation costs not to exceed $282,000.00 as well as a request for a class representative enhancement of $5,000.00 (ECF Document No. 96).  Defendant does not oppose this motion (ECF Document No. 97).  The hearing date for the fees, costs and enhancement award is also set for June 13, 2016 at 10:30 a.m.

## IV.   ARGUMENT

### A. Legal Standards for Final Approval of a Class Action Settlement

It is well established in the Ninth Circuit that "voluntary conciliation and settlement are the preferred means of dispute resolution." *Officers for Justice v. Civil Service Com.*, 688 F.2d 615, 625 (9th Cir. 1982). Class action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome and the typical length of the litigation. "There is an overriding public interest in settling and quieting the litigation," and this is particularly true in class action suits." *Von Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1989).

A class action may not be dismissed, compromised or settled without the approval of the Court. Fed. R. Civ. Proc. 23(e). The Court must determine that the settlement is fair, adequate and reasonable. See *Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); Fed. Rule Civ. Proc., Rule 23(e). The purpose of the requirement is "the protection of those class members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties," *Officers for Justice*, 688 F.2d at 624.

Courts have broad powers to determine whether a proposed settlement in a class action is fair. *Pridd v. Edelman*, 883 F.2d 438, 447 (6th Cir. 1989) ("In evaluating a proposed settlement of a class action, the district court is required to examine the terms of the settlement and the process by which the settlement was arrived at, to make sure that the terms are reasonable and that the settlement is not the product of fraud, overreaching, or collusion. The fact that the plaintiff might have received more if the case had been fully litigated is no reason not to approve the settlement.")

The review and approval of a class action settlement is done in two steps: an earlier conditional review by the trial Court (which has already taken place),

and then a further review after the period during which notice is distributed to the class members for their comment or objections (i.e. where we are now). *Newberg on Class Actions* (4th Ed.), the "bible of class actions," discusses the process for approving the settlement of a class action. At §11:24, "Procedure for Submitting Class Settlement for Approval," Newberg states:

> "When the parties to an action reach a monetary settlement, they will usually prepare and execute a joint stipulation of settlement, which is submitted to the court for preliminary approval. The stipulation should set forth the essential terms of the agreement, including but not limited to the amount of settlement, form of payment, manner of determining the effective date of settlement, and any recapture clause.... Usually the court will informally review these proposed settlement papers with counsel and then direct that notice of the proposed settlement and the hearing thereon be issued to all class members by mail, published notice, or a combination thereof. Counsel for the class plaintiffs will ordinarily submit, contemporaneously with the motion for settlement approval in a common fund class or within a reasonable time thereafter, a petition for allowance of fees and costs from the settlement amount. Often the court may require counsel to file such a petition along with or shortly after any proffered settlement proposals so that absent class members may be able to calculate or estimate their net recoveries in evaluating the settlement, and in order to permit the court to schedule a joint hearing for approval of both the settlement and the fee petitions. Alternatively, the plaintiff's counsel may agree at the time of submitting the settlement stipulation that they will petition for a reasonable fee not to exceed a given percentage of the common fund."

Pursuant to the Court's preliminary approval order (ECF Document 95, pg. 10), Plaintiff filed such a petition for fees, costs and class representative enhancement at least two weeks prior to the April 25, 2016 deadline for Class Members to file claims, object or request exclusion from the settlement. (See ECF Document 96, filed on April 11, 2016).

Newberg goes on to cite to the *Manual for Complex Litigation* (4th Ed.) which states at §30.41, "Procedure for Review and Approval:"

"Approval of class action settlements involves a two-step process. First, counsel submits the proposed terms of settlement and the court makes a preliminary fairness evaluation.  In some cases this initial evaluation can be made on the basis of information already known to the court, supplemented as necessary by briefs, motions, or informal presentations by the settling parties.  The court may want to hear not only from counsel but also from the named plaintiffs, from other parties, and from attorneys who did not participate in the negotiations. The judge may also, at this preliminary stage or later, hear the views of the parties' experts or seek the advice of a court-appointed expert or special master.  If the court has reservations, it may advise the parties, who may wish to resume negotiations in an effort to remove potential obstacles to approval.

If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys, and appears to fall within the range of possible approval, the courts should direct that notice under Rule 23(e) be given to the class members of a formal fairness hearing, at which arguments and evidence may be presented in support of and in opposition to the settlement.   For

economy, courts have in appropriate cases permitted the notice under Rule 23(c)(2) to be combined with the Rule 23(e) notice.  Approval is required of the settlement of any action brought as a class action, regardless of whether the settlement occurs prior to certification, and even if the only claims being settled are those of the individual plaintiffs, with the class claims being dismissed without prejudice. Notice is required of any settlement of class claims and is considered advisable even if only the individual claims of the named plaintiffs are settled."

This procedure assures class members of the protection of procedural due process safeguards, and enables the Court to fulfill its role as the guardian of class interests.

Now that the notice process has concluded, Plaintiff provides the details of the settlement claim process and requests that the Court conduct a final review of the terms of the settlement in conjunction therewith to determine whether the settlement is fair, adequate and reasonable.

## B. The Proposed Settlement Class Meets the Standard for Final Approval.

### 1. Sufficient Discovery Has Taken Place to Justify the Settlement.

"The stage of the proceedings and the amount of discovery completed" are factors courts consider in determining the fairness, reasonableness and adequacy of a settlement.  *In re Warner communications Sec. Litig.*, 618 F.Supp.7635, 741 (S.D.N.Y 1985), aff'd, 798 F.2d 35(2d Cir. 1986); *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975); *see also Weinberger v. Kendrick*, 698 F.2d 62, 75 (2d Cir. 1982).  This case has been vigorously litigated for nearly two years (twenty months).  During that time, there has been a considerable amount of necessary discovery served and responded to by both parties. Plaintiff's counsel conducted substantial discovery in this case, including formal written discovery, several

depositions of Defendant and depositions of third party witnesses, and third party subpoenas for records of telephone calls made by Lead Info Stream.  Defendant propounded formal written discovery to Plaintiff, took Plaintiff's deposition and issued several third party subpoenas requesting information pertaining to Plaintiff.  A detailed description of the discovery conducted was also set forth in Plaintiff's Motion for Preliminary Approval.  See Righetti Decl., ¶ 5.

Thus, over the course of this litigation, the parties have obtained an abundance of information through discovery to assist them in properly analyzing their respective positions.  Suffice to say the settlement reached is not the product of "guesswork," but rather the product of hard work by the attorneys throughout the two years this case has been litigated.  As the Court is aware, this is not a case that settled based on an "informal exchange" of information.  The case was diligently prosecuted, hotly contested and only settled on the eve of trial.

### 2.  Presumption of Fairness.

Courts presume the absence of fraud or collusion in negotiation of the settlement unless evidence to the contrary is offered.  In short, there is a presumption that the negotiations were conducted in good faith.  Newberg, §11.51, *In re Chicken Anti-Trust Litigation*, 560 F. Supp 957, 962 (MD GA 1980).  *Pridd v. Edelman*, 883 F.2d 438, 447 (6th Circuit 1989); *Mars Steel Corp. v. Continental Illinois National Bank and Trust Co*., 834 F.2d 677, 681 (7th Cir. 1987).  Courts do not substitute their judgment for that of the proponents, particularly when settlement has been reached by experienced counsel familiar with the litigation.  *Hammon v. Barry*, 752 F. Supp 1087 (DDC 1990); *Steinberg v. Carey*, 470 F. Supp 471 (SD NY 1979); *In re Armored Car Anti-Trust Litigation*, 472 F. Supp 1357 (ND GA 1979); *Sommers v. Abraham Lincoln Federal Savings & Loan Association*, 79 F.R.D. 571 (ED PA 1978).  While the recommendations of counsel proposing the settlement are not conclusive, the Court can properly take them into account, particularly if they have been involved

in litigation for some period of time, appear to be competent, have experience with this type of litigation and significant discovery has been completed.  See *Newberg* §11.47.

A presumption of fairness in a class action settlement agreement exists where:  (1) the settlement is reached through arm's-length bargaining; (2) investigation and discovery are sufficient to allow counsel and the court to act intelligently; (3) counsel is experienced in similar litigation; and (4) the percentage of objectors is small.  *Newberg* (3d ed. 1992) § 11.41, p. 11-91.

The proposed settlement before the Court meets each of these criteria. First, it was reached through arm's-length bargaining, which involved conferences with Magistrate Burdkhardt on two separate occasions (one in person and one telephonically).  In addition to the Mandatory Settlement Conference that took place on October 19, 2015, the parties sought guidance and assistance from Magistrate Judge Burkhardt regarding specific terms of the agreement during a telephonic conference on December 4, 2015.  See ECF Docket No. 84.  During all settlement discussions, which took place simultaneously as the case was being litigated, the parties conducted all of their negotiations at arm's-length, and, in spite of a mutual desire to resolve the case, always in an adversarial manner. During the final telephone conference, Magistrate Burkhardt expressed approval of the parties' efforts and described the proposed settlement as the best possible scenario in light of the parties' respective positions.  The settlement is thus fair, reasonable, adequate and in the best interest of the Class.  Declaration of Matthew Righetti, ¶8.

Second, the settlement only came to be following substantial amounts of formal discovery, the exchange of thousands of pages of documents and electronic records produced pursuant to third-party subpoenas, several depositions, two motions to dismiss, two motions requesting stays, a motion for summary judgment and motion for class certification.  A substantial investigation

was conducted by Plaintiff and her counsel through the use of formal and informal discovery (described above), and these efforts sufficiently allowed counsel and the Court to act intelligently.  It should be plainly evident to the Court based on the manner in which this case was litigated that this settlement is not the product of collusion or some other fraudulent behavior.  The parties litigated this case vigorously, through class certification, and only settled on the eve of trial.

Third, Class Counsel is experienced in similar litigation and endorses the settlement in light of the risks and complexities Plaintiff faced in proceeding through trial as well as the dire financial state of the Defendant.  It made little sense to take the risk necessary to achieve a victory at trial when Defendant would not be solvent to pay the judgment in any event.  All of these factors support the conclusion that allowing Class Members the opportunity to make a claim in line with other similar TCPA settlements is fair, reasonable and adequate. See Decl. of Matthew Righetti, which endorses and supports the settlement.

### 3.  Both Parties Face Significant Challenges.

Arriving at a settlement acceptable to both parties was no small achievement.  LeadPoint and its counsel felt strongly about their ability to prevail on the affirmative defense of express consent in light of evidence linking Plaintiff to a website containing a consent clause.  Conversely, Plaintiff believed strongly in her argument that Defendant had "reverse-engineered" consent due to the lack of any proof that Plaintiff had entered her information on the website at issue.  Moreover, even assuming she had inputted her information into the "consent" form, Plaintiff believed strongly that the consent did not apply to LeadPoint or constitute express consent to be dialed by LIS pursuant to the consent's express terms.  Separately, LeadPoint believed strongly that Plaintiff would not be able to establish that LeadPoint was vicariously liable for LIS's conduct, whereas

Plaintiff believed that LeadPoint's testimony sufficiently demonstrated control over LIS such that Plaintiff could affirmatively show Lead Info Stream acted as LeadPoint's agent.

Additionally, as the Court may recall, this is a case with imperfect record keeping and LIS, the primary actor with access to the actual call records it placed, declared bankruptcy in March of 2015. As a result, Plaintiff faced substantial hurdles both in ascertaining membership in the class and in her ability to demonstrate damages by determining the frequency of the calls placed to specific class members. There simply were no precise records or data demonstrating where or how LIS obtained Plaintiff's information and the information of any other potential Class Member. Similarly, Lead Info Stream used two separate dialing software companies, SafeSoft Solutions and ConnectFirst, during different time periods, thus it would have been a difficult and a painstaking process at best to calculate damages based on per call violations. The only reasonable solution to this problem was to provide notice to all individuals whose information was submitted to LeadPoint's platform by LIS after being dialed on a cell phone and allow them the opportunity to submit a claim, *regardless* of how LIS obtained their information. Decl. of Matthew Righetti ¶ 9 and 11.

The terms of the proposed agreement; however, provided the opportunity to receive compensation to all individuals who *could have potentially been dialed* illegally by Lead Info Stream -- regardless of whether they provided some type of consent -- and had their information sold on LeadPoint's platform. This outcome eliminated the risk of problems associated with Defendant's inadequate record keeping, which would have pervaded the entire trial no doubt. In sum, both parties faced substantial risks and a most uncertain outcome if these issues were to proceed to trial, and as a result, the risks, complexities and uncertainties of the case further support preliminary approval of the settlement.

1

2

### 4. The Settlement has Achieved a Fair Result for the Class Members Who Submitted Claims.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

The proposed settlement in this case created a common fund totaling $845,700.00.  Class Members were provided notice consistent with the Court-approved notice procedure and were given the opportunity to submit a claim form to receive up to twenty dollars ($20.00).  The amount per claim afforded to class members is consistent with other similar TCPA litigation that has been approved by federal courts in California.  *See, e.g. Rose v. Bank of Am. Corp.*, Case No. 11-cv-02390-EJD [claims made settlement approved where class members' cash award is between twenty dollars ($20.00) and forty dollars ($40.00) per claim, depending on the number of valid claims submitted]. *See also Malta v. Federal Home Loan Mortg. Corp.*, 2013 WL 444619, *7 (S.D. Cal, Feb. 5, 2013) [Order granting preliminary approval of claims made settlement wherein if each class member submitted a claim each class member would receive two dollars ($2.00), but if only 1% to 5% of class members submitted claims, each would be entitled to between $42.76 and $213.80].

17

18

19

20

21

22

23

24

25

26

27

Admittedly, in this case the claim rate was not impressive.  For example, as of April 7, 2016 – nearly one month after notices were emailed/mailed, the claim rate was 1.61%, including the 153 paper claims that were submitted without a Claim ID.  Recognizing that the claim rate was below the claim rate expected by the parties, Plaintiff and Defendant agreed to send a reminder notice via email and regular mail to Class Members, even though a reminder notice was not contemplated by the settlement agreement.  Heffler Claims sent the reminder postcard via email and regular mail on April 12, 2016, nearly two weeks before the April 25, 2016 deadline to submit a claim, request exclusion or file an objection.  See Decl. of Teresa Sutor.  In the end, the reminder notice did little to increase the total number of submitted claims.

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

### 5.  The Settlement Includes Prospective Relief

Importantly, in addition to the $20.00 monetary award for the 519 Class Members who submitted valid and timely claims, the Settlement Agreement includes prospective relief.  As a part of the Settlement Agreement, LeadPoint has agreed not to conduct future marketing activities by means of ATDS (Automatic Telephone Dialing System) whereby it initiates or causes to initiate unsolicited "robocall" transmissions or other telemarketing calls without express consent of the intended recipient of the call in the United States or its Territories. Furthermore, LeadPoint has agreed that it shall not permit vendors to conduct lead generation via LeadPoint's platform unless LeadPoint has taken actual steps to verify that such vendor complies with the TCPA, including but not limited to, verifying that the vendor has obtained express consent from the individuals prior to telemarketing them.  Decl. of Matthew Righetti, ¶ 10.

### 6.  The Low Claim Rate Should Not Prevent Final Approval.

The fact that relatively few claimants filed valid claims should not deter the Court from approving the settlement.  "The fact that the number of claims that were ultimately filed were less than anticipated does not have any effect on the negotiated Settlement Agreement." *Bellows v. NCO Fin. Sys., Inc.*, No. 07-CV-1413 W (AJB), 2009 WL 35468, at *7 (S.D. Cal. Jan. 5, 2009), citing *Beecher v. Able,* 441 F.Supp. 426 (S.D.N.Y.1977). This is a consumer class action, and historically consumer class actions do not result in as high a response rate as other types of class actions, such as wage and hour class actions.  Here, Heffler Claims Group administered the notice as ordered by the Court and took the additional step of sending a reminder notice to class members urging Class Members to submit claims ahead of the April 25, 2016 deadline.  Thus, proper notice was given, a claims procedure that liberally permitted the making of claims was implemented, and the procedure only required the Class Member to include a claim ID and physical address for the claim to be valid, which served to prevent

fraudulent claims.   (In this case, 153 individuals evidently learned of the settlement and submitted paper claims without Claim ID numbers.   These 153 individuals' names and contact information did not appear on the class list and it was determined by Heffler that they were fraudulent claims, thus they were excluded).

### C. The Low Claim Rate Should Not Affect the Court's Ruling On Plaintiff's Motion for Attorneys' Fees, Reimbursement of Litigation Costs or Request for Class Representative Enhancement.

Lastly, Plaintiff requests that the Court grant Plaintiff's motion for attorneys' fees, reimbursement of litigation costs and request for class representative enhancement, despite the low claim rate.   The Supreme Court has rejected the argument that the fees must be proportional with the damages recovered. *City of Riverside v. Rivera,* 477 U.S. 561, 581 (1986); *see also Johnson v. Eaton,* 80 F.3d 148 (5th Cir.1996); *Carroll v. Wolpoff & Abramson,* 961 F.2d 459 (4th Cir.1992), cert. denied, 505 U.S. 905 (1992).

The Court is no doubt aware of the amount of work conducted by Plaintiff and her counsel to achieve the settlement in this case.   It could not have been predicted that so few class members would file claims, and efforts were specifically made to ensure that the claim process would be streamlined to encourage the filing of claims.   Consequently, no reduction of counsel's fees is justified or necessary here.   In requesting a percentage of the common fund for attorneys' fees, Plaintiff's counsel is requesting a negative multiplier that reduces Plaintiff's counsel's lodestar by almost half.

### D. Costs of Administration.

Lastly, the Settlement Agreement calls for Defendant to pay costs of administration from the Settlement Fund, which are set forth in the Declaration of Teresa Sutor at ¶ 16.

**V. CONCLUSION**

For the reasons set forth herein, Plaintiff respectfully requests that this Court grant final approval to the settlement and grant the related relief.   The settlement is a fair result to those class members who submitted claims.   The settlement is agreed upon by the parties and is recommended by experienced counsel in class action cases.   Granting final approval will avoid further expense and uncertainty of litigation and provide a benefit to the Plaintiff and Class Members who submitted valid claims.

Respectfully submitted,

**RIGHETTI GLUGOSKI, P.C**

Dated: May 16, 2016                    s/ Michael Righetti
                                       Class Counsel