UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAOUL BENNETT, on behalf of herself and all similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>LEAD INFO STREAM, INC., DBA PROMEDIA LEADS; and LEADPOINT, INC.,<br><br>Defendants. | Case No.:  3:14-cv-01316-H-JLB<br><br>**FINAL JUDGMENT AND ORDER**<br><br>**(1) CERTIFYING SETTLEMENT CLASS;**<br><br>**(2) GRANTING FINAL APPROVAL OF CLASS SETTLEMENT; and**<br><br>**(3) APPROVING PLAINTIFF'S REQUEST FOR ATTORNEYS' FEES, COSTS, AND INCENTIVE PAYMENT**<br><br>[Doc. Nos. 96, 98] |

On August 12, 2014, Plaintiff Raoul Bennett ("Plaintiff") filed an amended purported class action complaint against Defendants Lead Info Stream, Inc. ("LIS") and LeadPoint, Inc. ("LeadPoint") alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.  (Doc. No. 13.)  On August 10, 2015, the Court granted

1

3:14-cv-01316-H-JLB

Plaintiff's motion for class certification. (Doc. No. 56.) The parties reached a settlement agreement, and, on March 3, 2016, the Court granted preliminary approval of the settlement, provisionally certified a settlement class under Federal Rule of Civil Procedure 23(b)(3), and approved the form and manner of notice. (Doc. No. 95.)

On April 11, 2016, Plaintiff filed an unopposed motion for attorneys' fees, litigation costs, and an incentive award. (Doc. No. 96.) On May 16, 2016, Plaintiff filed an unopposed motion for final approval of the settlement. (Doc. No. 98.) On June 13, 2016, the Court held a fairness hearing. No class member filed an objection, and no objectors appeared at the hearing. Michael Righetti appeared for Plaintiff. For the reasons that follow, the Court certifies the settlement class, grants final approval of the class settlement, and approves Plaintiff's request for attorneys' fees, costs, and an incentive award.

## **Settlement**

I.  Settlement Class

This is a class action lawsuit brought on behalf of cellular telephone users who allegedly received unsolicited calls from Defendants LeadPoint and LIS in violation of the TCPA. Plaintiff claims that Defendants violated the TCPA by making unsolicited robocalls to cellular telephones in violation of 47 U.S.C. § 227(b)(1)(A)(iii). (Doc. No. 13.) Plaintiff also asserts that Defendants made unsolicited calls to cellular telephones after the numbers were placed on the National Do-Not-Call Registry or LIS's internal do-not-call registry in violation of 47 U.S.C. § 227(c)(5). (Id.)

On August 10, 2015, the Court certified the following class:

> All individuals in the United States and its territories: (i) for whom LIS obtained leads as a result of their providing information on http://safeapply.com/LendingConsultant/ between May 28, 2010 and the present and (ii) who received at least one telephone call on their cellular telephone that was made or caused to be made by LIS between May 28, 2010 and the present through an ATDS (iii) that resulted in those individuals' information being posted on LeadPoint's platform—and (iv) excluding any calls made after the date those individuals' information was posted on LeadPoint's platform.

(Doc. No. 56 at 14.)

The settlement purports to include all individuals who potentially fall within the certified class as well as individuals whose information LIS obtained via other sources in addition to the SafeApply website. The settlement agreement defines the settlement class as:

> All individuals in the United States and its territories: (i) for whom LIS obtained leads between May 28, 2010 and the present and (ii) who received at least one telephone call on their cellular telephone that was made or caused to be made by LIS between May 28, 2010 and the present through an ATDS (iii) that resulted in those individuals' information being posted on LeadPoint's platform—and (iv) excluding any calls made after the date those individuals' information was posted on LeadPoint's platform.

(Doc. No. 92-2 at 21.)

After the Court certified the case as a class action, notice administrator Gilardi & Co., LLC initiated email notice on Dec. 9, 2015 to 42,285 email addresses belonging to individuals whose information had been provided by LIS to LeadPoint's platform. Gilardi's delivery report confirms that the email was successfully delivered to 96.71% of the email recipients, whereas 3.29% of the emails were "bounced," meaning that for a variety of reasons, such as invalid email addresses or spam blocks, the email was not delivered to the intended email addresses. Following the notice of class certification, 175 individuals (0.4% of potential class members) requested exclusion. (Doc. No. 92-2 at 6-7.)

II.     Settlement Consideration

Under the settlement agreement, LeadPoint agrees to pay a monetary award to class members. Each class member may submit one claim, and, if the claim is valid and timely submitted, that class member will receive $20. In addition to the monetary award for class members who submit timely claims, the settlement agreement includes prospective relief as a means to ensure that LeadPoint does not make future telemarketing calls using an automatic telephone dialing system without the express consent of the parties called and that it will not permit its vendors to use its platform unless the vendors can verify that they

obtained express consent to dial the leads that are being submitted to the platform. It states:

> LeadPoint agrees not to conduct any future marketing activities by means of ATDS whereby it initiates or causes to initiate unsolicited "robocall" transmissions or other telemarketing calls without express consent of the intended recipient of the call in the United States or its Territories. Furthermore, LeadPoint agrees that it shall not permit vendors to conduct lead generation via LeadPoint's platform unless LeadPoint has taken appreciable steps to verify that such vendor complies with the TCPA, including but not limited to, verifying that the vendor has obtained express consent from the individuals prior to telemarketing them.

(Doc. No. 92-2 at 24.)

III.     Scope of the Release

The settlement releases the following parties:

> Defendant LeadPoint, Inc. and any and all of its attorneys, present or past shareholders, owners, officers, directors, administrators, predecessors, successors, assigns, parents, affiliates, subsidiaries, associates, employers, employees, agents, customers (including but not limited to Quicken Loans, Inc. and LoanDepot.com, LLC) and vendors Lead Info Stream, Inc. d/b/a Promedia Leads and Pro Media, Inc., or any other representative of these persons or entities.

(Doc. No. 92-2 at 20.)

The settlement releases the released parties from

> any and all actual claims, demands, liabilities, rights, causes of action, damages, punitive, exemplary or multiplied damages, expenses, costs, attorneys' fees and or obligations (including "Unknown Claims" as defined [in the settlement agreement]), arising out of the facts, transactions, events, matters, occurrences, acts, disclosures, statements, misrepresentations, omissions or failures to act that were pled in the operative complaint relating to LeadPoint, Lead Info Stream, Inc. dba ProMedia Leads and Pro Media, Inc. and any representatives of these persons or entities, allegedly making unsolicited telephone calls using an ATDS to cellular telephone numbers and any resulting damages arising therefrom pursuant to the Telephone Consumer Protection Act. Specifically excepted from Released Claims are any claims that any governmental agency or governmental actor has against the Defendant and any claims Defendant may have against Lead Info Stream, Inc. d/b/a Promedia Leads and Pro Media, Inc., or any other of Defendant's

vendors involved in LeadPoint's alleged use of any ATDS to make unsolicited telephone calls to cellular telephone numbers as described in the Action.

(Doc. No. 92-2 at 20.)

## IV. Class Members' Notice of Settlement

Heffler Claims Group received class member data from Defendant on January 4, 2016, which contained 42,285 records of names, addresses and email addresses. (Doc. No. 98-2 at 2.) Heffler consolidated the data into 40,666 unique email addresses belonging to class members. After further organizing the data, Heffler sent 40,666 email notices and 1,564 paper notices by mail. (Id. at 2-3.) Heffler established a toll free number and website. Heffler received 29 calls to the toll free number, and the website had 6,804 visits. (Id.) After Heffler sent the email notices, Heffler determined that 391 class members did not receive the email, and Heffler physically mailed paper notices to the address of record for those 391 class members. (Id. at 3.) When 195 paper notices were returned as undeliverable, Heffler skip-traced those addresses and mailed the notices to 129 updated addresses. (Id. at 4.) The time period to submit claims, request exclusion from the settlement, or object to the settlement expired on April 25, 2016, and as of May 12, 2016, Heffler had received no requests for exclusion and no objections from class members. (Id. at 3-4.)

**Discussion**

## I. Settlement Class

A class may be certified under Rule 23(a) if (1) the class is so numerous that joinder of all members individually is impracticable; (2) questions of law or fact are common to the class; (3) the claims or defenses of the class representative are typical of the claims or defenses of the class; and (4) the person representing the class is able to fairly and adequately protect the interest of all members of the class. Furthermore, Rule 23(b)(3) requires a finding "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

In its order certifying the class, the Court determined that the class met the requirements of Rule 23(a) and Rule 23(b)(3).  (Doc. No. 56.)  The settlement class includes all of the individuals who were potential class members according to the Court's class definition.  This settlement allows the parties to provide a potential benefit to each individual about whom LIS submitted information to LeadPoint's platform and who LIS dialed on a cell phone regardless of how LIS obtained the individual's information.

The settlement class meets the numerosity, commonality, typicality, and adequacy of representation requirements pursuant to Rule 23(a) and the predominance and superiority requirements pursuant to Rule 23(b)(3).  The class contains approximately 42,285 individuals, each of whom was potentially dialed on a cell phone at least once by LIS allegedly on LeadPoint's behalf.  Common questions predominate, such as 1) whether LeadPoint is vicariously liable for the telemarketing practices of LIS; 2) whether LIS may rely on consent obtained by third parties to telemarket individuals using an ATDS; and 3) whether LIS utilized an ATDS as defined by the TCPA.  LeadPoint asserts common defenses as to each individual, including (1) that LIS had express consent to dial class members on their cell phones and (2) that LeadPoint is not vicariously liable for any of the calls because LIS was not its agent.  It would be impracticable to bring the claims of each of the 42,285 individuals before the Court to adjudicate these claims.  A class action is superior where adjudication of these common questions will resolve the claims of 42,285 individuals simultaneously.  Accordingly, the Court certifies the following settlement class:

> All individuals in the United States and its territories: (i) for whom LIS obtained leads between May 28, 2010 and the present and (ii) who received at least one telephone call on their cellular telephone that was made or caused to be made by LIS between May 28, 2010 and the present through an ATDS (iii) that resulted in those individuals' information being posted on LeadPoint's platform—and (iv) excluding any calls made after the date those individuals' information was posted on LeadPoint's platform.

///

///

6

3:14-cv-01316-H-JLB

II.   Settlement

Rule 23(e) requires a court to determine whether a proposed settlement is "fundamentally fair, adequate, and reasonable." Staton v. Boeing Co., 327 F.3d 938, 959 (9th Cir. 2003). To make this determination, a court must consider a number of factors, including: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of class members to the proposed settlement. Id. "In addition, the settlement may not be the product of collusion among the negotiating parties." In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 458 (9th Cir. 2000) (citing Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1290 (9th Cir. 1992)).

"In deciding whether to approve a proposed settlement, the Ninth Circuit has a 'strong judicial policy that favors settlements, particularly where complex class action litigation is concerned.'" In re Heritage Bond Litigation, 2005 WL 1594403, at *2 (C.D. Cal. June 10, 2005) (quoting Class Plaintiffs v. Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992)). The Ninth Circuit favors deference "to the private consensual decision of the [settling] parties," particularly where the parties are represented by experienced counsel. Rodriguez v. West Publishing Corp., 563 F.3d 948, 965 (9th Cir. 2009). "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlements by considering the likelihood of a plaintiff's or defense verdict, the potential recovery, and the chances of obtaining it, discounted to present value." Id.

A.   The Strength of Plaintiff's Case and Risk of Further Litigation

Both parties have expended significant time, effort, and resources supporting their positions, and they would continue to do so if the settlement failed to receive final approval. The disputed factual and legal issues would be complex and costly to resolve at trial. Both sides have considered the uncertainty and risk of the outcome of future litigation, the burdens of proof, and the general difficulties and delays of litigation. These considerations

led the parties to conclude that a timely settlement would be best for everyone involved. See Linney v. Cellular Alaska Partnership, 151 F.3d 1234, 1242 (9th Cir. 1998) ("[I]t is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlement.") (internal quotation marks and citation omitted). The Court concludes that the strength of the parties' positions as well as the risk of further litigation militate in favor of approving the settlement.

B.   The Amount Offered in Settlement

Class members who submitted claims will receive $20. This settlement is in line with other similar TCPA settlements that have been approved by federal courts in California. See, e.g., Rose v. Bank of Am. Corp., Case No. 5:11-cv-02390-EJD, ECF No. 59 at 14; ECF No. 67 (N.D. Cal. Dec. 6, 2013) (settlement approved where class members' cash award was expected to be between $20 and $40 per claim, depending on the number of valid claims submitted).

In addition to the $20 monetary award for class members who submit valid and timely claims, the settlement agreement includes prospective relief. As a part of the settlement agreement, LeadPoint has agreed not to conduct future marketing activities by means of an ATDS whereby it initiates or causes to initiate unsolicited "robocall" transmissions or other telemarketing calls in the United States or its Territories without express consent of the intended recipient of the call. Furthermore, LeadPoint has agreed that it will not permit a vendor to conduct lead generation via LeadPoint's platform unless LeadPoint has taken appreciable steps to verify that such vendor complies with the TCPA, including, but not limited to, verifying that the vendor has obtained express consent from individuals prior to telemarketing them. (Doc. No. 92-2 at 24.)

This settlement is a good result for the class and eliminates the risks, expenses, and delay associated with continued litigation. Moreover, the settlement amount is the result of arm's-length negotiation conducted by experienced counsel. Accordingly, the Court concludes that the amount offered in settlement weighs in favor of granting final approval of the settlement.

C.     The Extent of Discovery Completed and Stage of the Proceedings

The parties did not rush to settlement, and they vigorously litigated the case. This settlement follows substantial discovery, including depositions and the exchange of documents and electronic records. The parties also filed numerous motions. Indeed, the parties reached an agreement on the eve of trial.

The parties conducted all of their negotiations at arm's length and in an adversarial manner. In addition to the mandatory settlement conference that took place on October 19, 2015, the parties sought guidance and assistance from the magistrate judge during a telephonic conference on December 1, 2015. (Doc. Nos. 71, 84.) Over the course of this litigation, the parties have obtained an abundance of information through discovery to assist them in properly analyzing their respective positions. The settlement reached is not the product of guesswork. Accordingly, the parties' extensive investigation, discovery, and subsequent settlement discussions weigh in favor of granting final approval.

D.     The Experience and Views of Counsel

Plaintiff's counsel has extensive experience acting as class counsel in consumer class action cases, including cases involving the TCPA. (Doc. No. 96-1 at 2-5.) Class counsel recommends the settlement as both fair and adequate, a factor that weighs in favor of granting final approval. (Doc. No. 98-1 at 7.)

E.     The Reaction of the Class Members to the Proposed Settlement

As of May 12, 2016, Heffler had received 29 calls to the toll free number it established for this case and 6,804 visits to the website. (Doc. No. 98-2 at 2-3.) The time period to submit claims, request exclusion from the settlement, or object to the settlement expired on April 25, 2016, and as of May 12, 2016, Heffler had received no requests for exclusion and no objections from class members. (Id. at 3-4.) The complete lack of objections is indicative of the adequacy of the settlement. See Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action

are favorable to the class members."). Accordingly, the reaction of the class members weighs in favor of granting final approval.

F. Collusion

The collusion inquiry addresses the possibility the agreement is the result of either overt misconduct by the negotiators or improper incentives of certain class members at the expense of other members of the class. Staton v. Boeing Co., 327 F.3d 938, 960 (9th Cir. 2003). In the present case, because there is no evidence of overt misconduct, the Court's inquiry focuses on the aspects of the settlement that lend themselves to self-interested action.

The $5,000 incentive award for Plaintiff Raoul Bennett does not appear to be the result of collusion. The Court evaluates incentive awards using "'relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . [and] the amount of time and effort the plaintiff expended in pursuing the litigation . . . .'" Staton, 327 F.3d at 977 (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998)). Plaintiff Raoul Bennett has protected the interests of the class by engaging in investigation and discovery, attending a deposition, and assisting counsel with other aspects of the case. (Doc. No. 96-1 at 11-12, 24-27.) Therefore, the $5,000 award to Plaintiff Raoul Bennett appears to be reasonable in light of her efforts in this litigation.

Additionally, the attorneys' fees do not appear to be the result of collusion. Plaintiff's counsel may simultaneously negotiate the merits of the action and attorneys' fees. Staton, 327 F.3d at 971. The attorneys' fees and litigation costs sought by Plaintiff's counsel are reasonable under the circumstances.

After considering all applicable factors, the Court concludes the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); Staton, 327 F.3d at 960. Accordingly, the Court grants Plaintiff's motion for final approval of the settlement.

///

///

III.     Attorneys' Fees, Expenses, and Incentive Payment to Class Representative

With respect to the attorneys' fees, the Ninth Circuit has established a 25% "benchmark" for common fund cases. Stanger v. China Elec. Motor, Inc., 812 F.3d 734, 738 (9th Cir. 2016). This "benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." Six Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990). Regardless of whether the court uses the percentage approach or the lodestar method, the main inquiry is whether the end result is reasonable. Powers v. Eichen, 229 F.3d 1249, 1258 (9th Cir. 2000). The Ninth Circuit has identified a number of factors that may be relevant in determining if the award is reasonable: (1) the results achieved; (2) the risks of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee; (5) the burdens carried by class counsel; and (6) the awards made in similar cases. See Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1048-50 (9th Cir. 2002).

Here, Plaintiff has requested an award of $211,425 in attorneys' fees. The requested amount of attorneys' fees is 25% of the total settlement fund of $845,700. (Doc. No. 96-1 at 10.) The results achieved in this case were favorable. Class members are provided with immediate monetary and injunctive relief, and the overall award is substantial. Additionally, the risks of litigation were real and substantial. Further, the complexity and potential duration of the case, coupled with the intensity of settlement negotiations, indicate that a 25% award is reasonable. Moreover, class counsel took this case on a contingent fee basis, bearing the entire risk and cost of litigation. (Doc. No. 96-1 at 6-8.) The request for attorneys' fees in the amount of 25% of the common fund follows the Ninth Circuit's benchmark. See Vasquez v. Coast Valley Roofing, Inc., 266 F.R.D. 482, 491 (E.D. Cal. 2010) ("The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark."). Finally, class counsel has represented that the fees calculated under the lodestar method would be

$365,815. (Doc. No. 96-1 at 19.) Thus, the amount class counsel requests is approximately 58% of what class counsel would receive under the lodestar method. See In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 944-45 (9th Cir. 2011) (encouraging district courts to cross-check their calculations under the percentage-of-recovery method against the lodestar method). Accordingly, the Court concludes that the request for fees is reasonable and grants class counsel $211,425 in attorneys' fees.

Plaintiff has represented to the Court that class counsel has incurred litigation expenses in the amount of $74,219.71. (Doc. No. 96-1 at 21.) After reviewing counsel's declaration regarding expenses, the Court concludes that the request for $70,575 in litigation expenses is reasonable and grants class counsel's request for these fees. Similarly, Plaintiff's request for $70,450 in expenses for the settlement administrator is reasonable, and the Court grants the request for these costs. (Doc. Nos. 98 at 27, 98-2 at 4.)

Finally, the $5,000 incentive payment for class representative Raoul Bennett is reasonable. "The criteria courts may consider in determining whether to make an incentive award include: 1) the risk to the class representative in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the class representative; 3) the amount of time and effort spent by the class representative; 4) the duration of the litigation and; 5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation." Cox v. Clarus Mktg. Grp., LLC, 291 F.R.D. 473, 483 (S.D. Cal. 2013) (citations omitted). After reviewing these factors, the Court concludes that the requested incentive payment is reasonable. The $5,000 award is well within the acceptable range awarded in similar cases. See, e.g., Fulford v. Logitech, Inc., No. 08-CV-02041, 2010 WL 807448, at *3 n.1 (N.D. Cal. 2010) (collecting cases awarding incentive payments ranging from $5,000 to $40,000). Plaintiff Raoul Bennett has protected the interests of the class by engaging in investigation and discovery, attending a deposition, and assisting counsel with other aspects of the case. (Doc. No. 96-1 at 11-12, 24-27.) Accordingly, the Court approves the $5,000 incentive payment for Plaintiff Raoul Bennett.

## Conclusion

The Court has jurisdiction over the subject matter of this action and all parties to the action, including all settlement class members. The Court certifies the settlement class and grants final approval of the settlement. All persons who satisfy the class definition, except those class members who timely and validly excluded themselves from the class, are settlement class members bound by this judgment. The form and method of notice satisfied the requirements of the Federal Rules of Civil Procedure and the United States Constitution, including the Due Process Clause.

The Court grants class counsel $211,425 in attorneys' fees and $70,575 in expenses. The Court grants the settlement administrator $70,450 in expenses. The Court grants class representative Raoul Bennett an incentive payment of $5,000. The attorneys' fees, expense awards, and incentive payment will be paid out of the settlement fund created by Defendant LeadPoint.

Without affecting the finality of this judgment, the Court reserves jurisdiction over the implementation, administration, and enforcement of this judgment and the settlement and all matters arising thereunder. This document shall constitute a judgment for purposes of Rule 58 of the Federal Rules of Civil Procedure. The Court dismisses the action with prejudice without any costs to any of the parties as against the others.[1] The Court enters final judgment.

**IT IS SO ORDERED.**

DATED: June 13, 2016

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

---

[1] Plaintiff seeks a final judgment and is not proceeding against Defendant LIS.